UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. _____ |
| | ) | |
| MARTIN MARIETTA | ) | |
| MAGNESIA SPECIALTIES, LLC, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## COMPLAINT

The United States of America, by authority of the Attorney General of the United States and through the undersigned counsel, acting at the request of the Administrator of the United States Environmental Protection Agency ("EPA"), alleges:

## NATURE OF THE ACTION

1. This is a civil action brought against Defendant Martin Marietta Magnesia Specialties ("MMMS" or "Defendant") pursuant to Sections 113(b) and 167 of the Clean Air Act ("CAA" or the "Act"), 42 U.S.C. §§ 7413(b) and 7477, for injunctive relief and assessment of civil penalties for one or more violations of:

      (a)    The Prevention of Significant Deterioration ("PSD") provisions of the Act, 42 U.S.C. §§ 7470-92, and the PSD regulations set forth at 40 C.F.R. § 52.21;

      (b)    The National Emission Standards for Hazardous Air Pollutants ("NESHAP") provisions of the Act, 42 U.S.C. § 7412, and the NESHAP regulations governing lime manufacturing plants, codified at 40 C.F.R. Part 63, Subparts A and AAAAA ("Lime MACT");

(c)     The provisions of the federally-enforceable Ohio State Implementation Plan ("Ohio SIP") that incorporate the relevant requirements of the PSD and/or NESHAP provisions of the Act, as outlined below; and

(e)     Title V of the Act, 42 U.S.C. §§ 7661-7661f; Title V's implementing federal regulations, codified at 40 C.F.R. Part 70; the Ohio Title V Permit Rules, Ohio Administrative Code ("OAC") Chapter 3745-77; and Defendant's Title V permit.

2.      Defendant is the owner and operator of a lime manufacturing plant located at 755 Lime Road, Woodville, Sandusky County, Ohio ("the Facility" or "Woodville Facility"). The Facility includes five rotary kilns, numbered 1, 2, 4, 5, and 6. At all times relevant to the Complaint, Defendant has owned Kilns #4, #5, and #6, collectively known as the North Plant.

3.      In or around 1982, Woodville Lime and Chemical Co. ("Woodville Lime") sold the South Plant, consisting of Kilns #1 and #2, to the Defendant. Before the sale, Woodville Lime had modified Kilns #1 and #2 and subsequently operated the kilns without first obtaining proper permits authorizing the modification and subsequent operation of the units, and without installing and employing the best available control technology ("BACT") to control emissions of sulfur dioxide ("$SO_2$") and nitrogen oxides ("$NO_x$"), as the Act requires.

4.      After purchasing the Facility, Defendant subsequently separately modified all five kilns, and thereafter operated the Facility without first obtaining proper permits authorizing the modification and subsequent operation of the units, and without installing and employing BACT to control emissions of $SO_2$ and $NO_x$, as the Act requires.

5.      As a result of Defendant's operation of the Facility following these modifications and the absence of appropriate controls, excessive amounts of $NO_x$ and $SO_2$ have been, and continue to be, released into the atmosphere each year.

6.     Additionally, Defendant has operated, and upon information and belief, continues to operate, the Facility while repeatedly exceeding opacity limitations established in the Lime MACT and the Ohio SIP.

7.     The violations described above also constitute violations of Defendant's Title V operating permit, issued by Ohio EPA, and as such, are violations of the Title V provisions of the Act.

## JURISDICTION AND VENUE

8.     This Court has jurisdiction over the subject matter of this action and over the parties pursuant to Section 113(b) of the Act, 42 U.S.C. § 7413(b), and pursuant to 28 U.S.C. §§ 1331, 1345, and 1355(a).

9.     Venue is proper in this District pursuant to Section 113(b) of the Act, 42 U.S.C. § 7413(b), and 28 U.S.C. §§ 1391(b) and 1395(a), because the violations that constitute the basis for this Complaint occurred in this District and the lime manufacturing facility at issue is operated in this District.

## NOTICES

10.     On July 15, 2010, EPA issued a Notice of Violation/Finding of Violation ("NOV/FOV") to MMMS for violations of the PSD regulations incorporated into the Ohio SIP, pursuant to Section 113(a)(1) and (a)(3) of the Act, 42 U.S.C. § 7413(a)(1) and (a)(3), and provided a copy of the NOV/FOV to the State of Ohio.

11.     On February 1, 2011, EPA issued a second NOV/FOV to MMMS for violations of the Lime MACT, 40 C.F.R. Part 63, Subparts A and AAAAA, issued pursuant to Section 112(f)(4) of the Act, 42 U.S.C. § 7412(f)(4).

12.     More than 30 days has elapsed since the issuance of the NOV/FOVs referred to in the preceding paragraphs.

13.     MMMS and the State of Ohio have had actual notice of the violations of the requirements or prohibitions of an applicable SIP or permit alleged against MMMS in this Complaint for at least 30 days before the filing of this Complaint, in accordance with Section 113(a)(1) of the Act, 42 U.S.C. § 7413(a)(1).

14.     The United States has provided notice of the commencement of this action to the State of Ohio, pursuant to Section 113(b) of the Act, 42 U.S.C. § 7413(b).

THE DEFENDANT

15.     Defendant MMMS is a North Carolina limited liability company headquartered in Raleigh, North Carolina, and is a wholly-owned subsidiary of Martin Marietta Materials, Inc., a North Carolina corporation with its principal place of business in Raleigh.

16.     MMMS is the owner and operator of the Facility – a dolomitic quicklime manufacturing plant in Woodville, Ohio.

17.     MMMS is a "person" within the meaning of Section 302(e) of the Act, 42 U.S.C. § 7602(e).

STATUTORY AND REGULATORY BACKGROUND

18.     The Clean Air Act is designed to protect and enhance the quality of the nation's air so as to promote the public health and welfare and the productive capacity of its population. Section 101(b)(1) of the Act, 42 U.S.C. § 7401(b)(1).

A. National Ambient Air Quality Standards

19.     Section 108(a) of the Act, 42 U.S.C. § 7408(a), requires the Administrator of EPA to identify and prepare air quality criteria for each air pollutant, emissions of which may

endanger public health or welfare, and the presence of which results from numerous or diverse mobile or stationary sources. For each such "criteria" pollutant, Section 109 of the Act, 42 U.S.C. § 7409, requires EPA to promulgate national ambient air quality standards ("NAAQS") requisite to protect the public health and welfare.

20.     Pursuant to Sections 108 and 109 of the Act, 42 U.S.C. §§ 7408 and 7409, EPA has identified sulfur dioxide ("$SO_2$") and nitrogen dioxide ("$NO_2$"), a form of nitrogen oxides ("$NO_x$"), as criteria pollutants, and has promulgated NAAQS for such pollutants. 40 C.F.R. §§ 50.4, 50.5, and 50.11.

21.     $SO_2$ and $NO_x$ when emitted into the air can each have adverse environmental and health impacts. $SO_2$ interacts in the atmosphere to form sulfate aerosols, which may be transported long distances through the air. Most sulfate aerosols are particles that can be inhaled. In the eastern United States, sulfate aerosols comprise 25 percent of the inhalable particles and, according to recent studies, high levels of sulfate aerosols are associated with increased sickness and mortality from lung disorders, such as asthma and bronchitis. Lowering sulfate aerosol emissions may significantly reduce the incidence and the severity of asthma and bronchitis and associated hospital admissions and emergency room visits.

22.     Nitrogen oxides have numerous adverse effects on health and welfare. $NO_x$ reacts with other pollutants and sunlight to form ground level ozone, which scientists have long recognized as being harmful to human health and the environment. Ozone can cause decreases in lung function (especially among children who are active outdoors) and respiratory problems leading to increased hospital admissions and emergency room visits. Ozone may inflame and possibly cause permanent damage to people's lungs. In addition, ozone causes damage to vegetation. Nitrogen dioxide, one type of $NO_x$, is a dangerous pollutant that can cause people to

have difficulty breathing by constricting lower respiratory passages; it may weaken a person's immune system, causing increased susceptibility to pulmonary and other forms of infections. While children and asthmatics are the primary sensitive populations, individuals suffering from bronchitis, emphysema, and other chronic pulmonary diseases have a heightened sensitivity to $NO_2$ exposure.

23.    $SO_2$ and $NO_x$ interact in the atmosphere with water and oxygen to form nitric and sulfuric acids, commonly known as acid rain. Acid rain, which also comes in the form of snow or sleet, "acidifies" lakes and streams rendering them uninhabitable by aquatic life, and it damages trees at high elevations. Acid precipitation accelerates the decay of building materials and paints, including irreplaceable buildings, statues, and sculptures that are part of our nation's cultural heritage.

24.    Under Section 107(d) of the Act, 42 U.S.C. § 7407(d), each state is required to designate those areas within its boundaries where the air quality is better or worse than the NAAQS for each criteria pollutant, or where the air quality cannot be classified due to insufficient data. An area that meets the NAAQS for a particular pollutant is termed an "attainment" area with respect to such pollutant. An area that does not meet the NAAQS for a particular pollutant is termed a "nonattainment" area with respect to such pollutant. An area that cannot be classified as either "attainment" or "nonattainment" with respect to a particular pollutant due to insufficient data is termed "unclassifiable" with respect to such pollutant.

25.    Section 110 of the CAA, 42 U.S.C. § 7410, requires each state to adopt and submit to EPA for approval a SIP that provides for the attainment and maintenance of the NAAQS within the state.

26. At all times relevant to this Complaint, Sandusky County, Ohio, the area in which the Facility is located, has been classified as attainment or unclassifiable for $NO_2$ and $SO_2$.

B. Prevention of Significant Deterioration Requirements

27. Part C of Title I of the Act, 42 U.S.C. §§ 7470-7492, sets forth requirements for the prevention of significant deterioration of air quality in those areas designated as either attainment or unclassifiable for purposes of meeting the NAAQS standards. These requirements are designed to protect public health and welfare, to assure that economic growth will occur in a manner consistent with the preservation of existing clean air resources, and to assure that any decision to permit increased air pollution is made only after careful evaluation of all the consequences of such a decision and after public participation in the decision making process. These CAA provisions and their implementing regulations at 40 C.F.R. Part 52.21 are referred to herein as the "PSD Program."

28. Section 165(a) of the Act, 42 U.S.C. § 7475(a), and 40 C.F.R. § 52.21(a)(2)(iii), prohibit the construction, major modification, and subsequent operation of a "major emitting facility" in an area designated as attainment or unclassifiable unless a permit has been issued that comports with the requirements of Section 165 and the facility employs the best available control technology ("BACT") for each pollutant subject to regulation under the Act that is emitted from the facility.

29. Section 169(1) of the Act, 42 U.S.C. § 7479(1), designates lime plants which emit or have the potential to emit one hundred tons per year ("TPY") or more of any regulated air pollutant to be "major emitting facilities."

30. Sections 110(a) and 161 of the Act, 42 U.S.C. §§ 7410(a) and 7471, require each state to adopt a SIP that contains emission limitations and such other measures as may be

necessary to prevent significant deterioration of air quality in areas designated as attainment or unclassifiable. A state may comply with Sections 110(a) and 161 of the Act, 42 U.S.C. §§ 7410(a) and 7471, by having its own PSD regulations, which must be at least as stringent as those set forth at 40 C.F.R. § 51.166, approved by EPA as part of its SIP. If a state does not have a PSD program that has been approved by EPA and incorporated into its SIP, the federal PSD regulations set forth at 40 C.F.R. § 52.21 may be incorporated by reference into the SIP. 40 C.F.R. § 52.21(a).

31.     The United States' PSD claims arise under two sets of regulations. The first set of regulations, 40 C.F.R. § 52.21, was incorporated by reference into the Ohio SIP. The second set of regulations is Ohio's PSD program, codified at Ohio Adm. Code 3745-31-11 through 3745-31-20, which was approved by EPA as part of the Ohio SIP.

### 1.  PSD Regulations Applicable to Count I

32.     On August 7, 1980, EPA disapproved Ohio's proposed PSD program, 45 Fed. Reg. 52741 (Aug. 7, 1980), and incorporated by reference the PSD regulations of 40 C.F.R. § 52.21(b) through (w) into the Ohio SIP. 40 C.F.R. § 52.1884. On January 29, 1981, EPA delegated to Ohio the authority to implement the federal PSD program incorporated into the Ohio SIP. 46 Fed. Reg. 9580 (Jan. 29, 1981).

33.     The regulations appearing at 40 C.F.R. § 52.21 were incorporated into and part of the Ohio SIP at the time of the modifications described in Count I of this Complaint. All citations to the PSD regulations herein refer to the provisions of 40 C.F.R. § 52.21 incorporated into and part of the Ohio SIP as applicable at the time of the major modifications alleged in Count I of this Complaint.

34.     The PSD regulations  set forth in 40 C.F.R. § 52.21 apply to any "major  stationary  source" that intends to construct a "major  modification"  in an attainment  or unclassifiable  area. 40 C.F.R. § 52.21(i)(2).

35.     Under the PSD regulations,  "major stationary source" is defined to include, *inter alia*, lime plants that emit or have the potential to emit one hundred tons per year or more of any regulated pollutant.   40 C.F.R. § 52.21(b)(1)(i)(a).

36.     Prior to August 7, 1980, a "major  modification"  was defined as "[a]ny physical change in, change in the method of operation of, or any addition  to a stationary source which increases the potential emission  rate of any air pollutant . . . by . . . 100 tons per year or more . . . ." 40 C.F.R. § 52.21(b)(2)  (1977 version).

37.     "Major modification"  is currently defined at 40 C.F.R. § 52.21(b)(2)(i)  as any physical change or change in the method of operation of a major stationary source that would result in a significant  net emission  increase of any pollutant  subject to regulation  under the Act.

38.     "Net emissions  increase" means the amount by which the sum of the following exceeds zero: "[a]ny increase in actual emissions  from a particular  physical change or change in method of operation at a stationary source" and "[a]ny other increases and decreases in actual emissions  at the source that are contemporaneous  with the particular  change and are otherwise creditable."  40 C.F.R. § 52.21(b)(3)(i).

39.     A "significant"  net emissions  increase means an increase in the rate of emissions that would equal or exceed any of the following  rates for the following  pollutants:  40 tons per year of $NO_x$, and 40 tons per year of $SO_2$.  40 C.F.R. § 52.21(b)(23)(i).

40.     The PSD regulations  define "actual emissions"  as the average rate, in tons per year, at which the unit "actually  emitted the pollutant  during  a two-year period which precedes

the particular date" and which is representative of normal operation.  40 C.F.R.

§ 52.21(b)(21)(i)-(ii).  In addition,  for any emissions  unit that "has not begun  normal operations

on the particular date, actual emissions  shall equal the potential  to emit of the unit on that date."

40 C.F.R. § 52.21(b)(21)(iv).

41.    Under the PSD regulations,  "construction"  means "any physical change or change

in the method of operation  (including  fabrication,  erection, installation,  demolition,  or

modification  of an emissions  unit)" that "would  result in a change in actual emissions."   40

C.F.R. § 52.21(b)(8);  *see also* 42 U.S.C. § 7479(2)(C) ("construction"  includes  the

"modification"  (as defined in Section 111(a) of the Act, 42 U.S.C. § 7411(a)) of any source or

facility).

42.    If a source is a major stationary source in an attainment or unclassifiable  area

planning  to construct a major modification  under the foregoing definitions,  then it is subject to

the requirements of paragraphs (j) through (r) of 40 C.F.R. § 52.21.  A major stationary source

subject to the requirements of paragraphs (j) through  (r) must, among other things,  perform an

analysis of source impacts, perform air quality modeling  and analysis, apply BACT, and allow

for meaningful  public  participation  in the process.  40 C.F.R. § 52.21(j)-(r).

43.    Any owner or operator of a source or modification  subject to 40 C.F.R. § 52.21(j)-

(r) who constructs or operates a source not in accordance with a PSD permit application  or

commences construction  without  applying  for and receiving approval in accordance with the

such regulations  is subject to an enforcement action.  40 C.F.R. § 52.21(r)(1).

2.  PSD Regulations  Applicable  to Count II

44.    On October 10, 2001, EPA conditionally  approved  revisions to the Ohio SIP to

incorporate  Ohio's PSD program, effective October 10, 2001.  66 Fed. Reg. 51570 (Oct. 10,

2001).  On January 22, 2003, EPA granted final approval for Ohio's PSD program, effective March 10, 2003.  68 Fed. Reg. 2909 (Jan. 22, 2003).

45.     The PSD provisions in the Ohio SIP are codified at Ohio Adm. Code 3745-31-11 through 3745-31-20, and apply to any "major stationary source" or "major modification" that begins actual construction in an attainment area.  Ohio Adm. Code 3745-31-13(A).

46.     Under the Ohio SIP, "major stationary source" is defined to include, *inter alia*, lime plants that emit or have the potential to emit one hundred tons per year or more of any regulated pollutant.  Ohio Adm. Code 3745-31-01(LLL)(2)(a)(xii).

47.     Under the Ohio SIP, "major modification" is defined at Ohio Adm. Code 3745-31-01(JJJ) as any physical change in or change in the method of operation of a major stationary source that would result in a significant emissions increase of a regulated pollutant, and a significant net emissions increase of that pollutant from the major stationary source.

48.     Under the Ohio SIP, "net emissions increase" means the amount by which the sum of the following exceeds zero:  "[a]ny increase in emissions from a particular physical change or change in the method of operation at a stationary source" and "[a]ny other increases and decreases in actual emissions at the stationary source that are contemporaneous with the particular change and are otherwise creditable."  Ohio Adm. Code 3745-31-01(TTT)(1)-(2).

49.     Under the Ohio SIP, a "significant" net emissions increase includes but is not limited to an increase in the rate of emissions that would equal or exceed the following rate for the following pollutant:  40 tons per year of $SO_2$.  Ohio Adm. Code 3745-31-01(MMMMM)(1).

50.     Under the Ohio SIP, "actual emissions" is the average rate, in tons per year, at which the emissions unit actually emitted the pollutant during a consecutive twenty-four month period which precedes the particular date and which is representative of normal emissions unit

operation." Ohio Adm. Code 3745-31-01(C)(1). In addition, for any emissions unit that "has not begun normal operations on the particular date, actual emissions shall equal the potential to emit of the emissions unit on that date." Ohio Adm. Code 3745-31-01(C)(3).

51. Under the Ohio SIP, "construction" means "any physical change or change in the method of operation (including fabrication, erection, installation, demolition or modification of an emissions unit) that would result in a change in emissions." Ohio Adm. Code 3745-31-01(DD); *see also* 42 U.S.C. § 7479(2)(C) ("construction" includes the "modification" (as defined in Section 111(a) of the Act, 42 U.S.C. § 7411(a)) of any source or facility).

52. If a source is a major stationary source in an attainment or unclassifiable area planning to construct a major modification under the foregoing definitions, then it is subject to the requirements of Ohio Adm. Code 3745-31-01 through 3745-31-20. A major stationary source subject to the requirements of Ohio Adm. Code 3745-31-01 through 3745-31-20 must, among other things, perform an analysis of source impacts, perform air quality modeling and analysis, apply BACT, and allow for meaningful public participation in the process. Ohio Adm. Code 3745-31-01 through 3745-31-20.

53. No major stationary source to which the requirements of Ohio Adm. Code 3745-31-01 through 3745-31-20 apply shall begin actual construction of a major modification without a permit which states that the stationary source or modification will meet those requirements (a "PSD permit"). Ohio Adm. Code 3745-31-13(A). Any owner or operator of a source or modification subject to Ohio Adm. Code 3745-31-01 through 3745-31-20 who constructs or operates a source not in accordance with such regulations is subject to an enforcement action under Section 113 of the Act, 42 U.S.C. § 7413. 40 C.F.R. § 52.23.

C. <u>National Emission Standards for Hazardous Air Pollutants</u>

54.     Section 112(b) of the Act, 42 U.S.C. § 7412(b), establishes a list of hazardous air pollutants ("HAPs"). Under Section 112(b)(2) of the Act, 42 U.S.C. § 7412(b)(2), EPA periodically reviews the list of hazardous air pollutants and, where appropriate, revises the list by rule.

55.     Section 112(c) of the Act, 42 U.S.C. § 7412(c), requires the EPA Administrator to publish a list of all categories and subcategories of major sources and certain area sources of hazardous air pollutants listed pursuant to 42 U.S.C. § 7412(b).

56.     Section 112(d)(1) of the Act, 42 U.S.C. § 7412(d)(1), requires the EPA Administrator to promulgate regulations establishing emission standards for each category and subcategory of major sources and area sources of HAPs. These emission standards are known as National Emission Standards for Hazardous Air Pollutants ("NESHAPs").

57.     Section 112(d)(2) of the Act, 42 U.S.C. § 7412(d)(2), provides that emission standards promulgated under Section 112(d)(1) require "the maximum degree of reduction in emissions of the [HAPs] . . . that the Administrator, taking into consideration the cost of achieving such emission reduction, and any non-air quality health and environmental impacts and energy requirements, is achievable . . . ." NESHAPs based on Maximum Achievable Control Technology are referred to as "MACT standards".

58.     The NESHAPs apply to facilities that are "major sources" of HAPs, 40 C.F.R. § 63.1500(b), which are sources or groups of stationary sources located within a contiguous area and under common control that emit or have the potential to emit 10 tons per year or more of any HAP, or 25 tons per year or more of any combination of HAPs. 42 U.S.C. § 7412(a)(1); 40 C.F.R. § 63.2. An "area source" is any stationary source of HAPs that is not a major source. 42

U.S.C § 7412(a)(2).  A "stationary source" is any building, structure, facility, or installation that emits or may emit any air pollutant.   42 U.S.C. § 7412(a)(3) (by reference to 42 U.S.C. § 7411(a)).

59.     On January 5, 2004, EPA promulgated the NESHAP for Lime Manufacturing Plants ("Lime MACT"), which is set forth at 40 C.F.R. Part 63, Subpart AAAAA.  69 Fed. Reg. 416 (Jan. 5, 2004).  The Lime MACT regulates particulate matter ("PM") as a surrogate for non-mercury HAP metals.

60.     Pursuant to 40 C.F.R. § 63.7081(a), the requirements of the Lime MACT apply to the owner or operator of a lime manufacturing plant that is a major source, or that is located at, or is part of, a major source of HAP emissions.   The owner or operator of an existing affected source was required to comply with the requirements of the Lime MACT by January 5, 2007.  40 C.F.R. § 63.7083(b).

61.     Section 112(f)(4) of the Act, 42 U.S.C § 7412(f)(4), prohibits the emission of HAPs in violation of the promulgated emission standards.

62.     Pursuant to Section 112(d) of the Act, 42 U.S.C § 7412(d), EPA has promulgated general NESHAP provisions, codified at 40 C.F.R. Part 63, Subpart A, §§ 63.1 – 63.16 ("Subpart A"). The provisions of Subpart A apply to the owners or operators of affected sources to the extent that Subpart A is incorporated into the NESHAP regulations governing various source categories.  40 C.F.R. § 63.1(a)(4)(i).

63.     Pursuant to 40 C.F.R. § 63.7100(c), the Lime MACT requires the owner or operator of an affected source to comply with the Subpart A provisions found at 40 C.F.R § 63.6(e)(1)(i).  40 C.F.R. § 63.6(e)(1)(i) requires the owner or operator of an affected source, at all times, including periods of startup, shutdown, and malfunction, to operate and maintain any

affected source, including associated air pollution control equipment and monitoring equipment, in a manner consistent with safety and good air pollution control practices for minimizing emissions.

64.    Sections 113(a)(3) and (b) of the Act, 42 U.S.C. §§ 7413(a)(3) and (b) prohibit violations of any NESHAP regulation. Thus, a violation of a NESHAP regulation is a violation of the Act.

### D.  Title V Permit Program

65.    Title V of the Act, 42 U.S.C. §§ 7661-7661f, establishes an operating permit program for certain sources, including "major sources" and any source required to have a PSD permit. The purpose of Title V is to ensure that all "applicable requirements" that a given source must comply with under the Act, including NESHAP requirements, are collected in one place, *i.e.* a Title V operating permit.

66.    Federal regulations promulgated pursuant to CAA Title V are codified at 40 C.F.R. Part 70.

67.    Pursuant to Section 502 of the Act, no source may operate without a Title V permit that lists all the requirements under the Act that are applicable to the source after the effective date of any permit program approved or promulgated under Title V of the Act. 42 U.S.C. § 7661a(a). 40 C.F.R. § 70.7(b).

68.    Pursuant to Section 502(b) of the Act, 42 U.S.C. § 7661a(b), on July 21, 1992, EPA promulgated regulations implementing the requirements of Title V and establishing the minimum elements of a major source operating permit program to be administered by any air pollution control agency. 57 Fed. Reg. 32250 (July 21, 1992). These regulations are codified at 40 C.F.R. Part 70.

69.     The Ohio Title V program was granted final approval by EPA, effective October 1, 1995.  60 Fed. Reg. 42045 (August 15, 1995).  Ohio's Title V operating permit program is currently codified in the Ohio Administrative Code at Ohio Adm. Code 3745-77.

70.     Section 502(a) of the act, 42 U.S.C. § 7661a(a), the federal Title V regulations (40 C.F.R. § 70.7(b)), and the Ohio Title V operating permit program regulations (Ohio Adm. Code 3745-77-02(A)) have at all relevant times made it unlawful for any person to violate any requirement of a permit issued under Title V or to operate a major source except in compliance with a permit issued by a permitting authority under Title V.

71.     Section 504(a) of the Act, 42 U.S.C. § 7661c(a), the federal Title V regulations (40 C.F.R. §§ 70.1(b), 70.6(a)), and the Ohio Title V operating permit program regulations (Ohio Adm. Code § 3745-77-07) have at all relevant times required that each Title V permit include, among other things, enforceable emission limitations and such other conditions as are necessary to assure compliance with applicable requirements of the Act and the requirements of the applicable SIP.  These requirements include any PSD requirements, including the requirement to comply with an emission rate that meets BACT, as well as any applicable NESHAP requirements.

72.     Section 503(c) of the Act, 42 U.S.C. § 7661b(c), provides that any person required to have a permit must submit to the permitting authority a compliance plan describing how the source will comply with all applicable requirements, and an application for a permit signed by a responsible official who must certify the accuracy of the information submitted.

73.     40 C.F.R. § 70.5 and Ohio Adm. Code 3745-77-03 require any owner or operator of a source subject to Title V permitting requirements to submit a complete permit application which, among other things, identifies all applicable requirements (including the PSD

requirements such as the requirement to comply with an emission rate that meets BACT, as well as NESHAP requirements), certifies compliance with all applicable requirements, and contains a compliance plan for all applicable requirements for which the source is not in compliance.

74. Title V permit applicants are required to submit supplementary facts or corrected information as necessary to the permitting authority after submitting an initial application where such application contains incorrect information and to provide additional information to address any requirements that become applicable to the source after the date it filed a complete application but prior to release of a draft permit. 40 C.F.R. § 70.5(b); OAC 3747-77-03(F).

<u>ENFORCEMENT PROVISIONS</u>

75. Sections 113(a)(1) and (3) of the Act, 42 U.S.C. § 7413(a)(1) and (3), provide that the Administrator may bring a civil action in accordance with Section 113(b) of the Act, 42 U.S.C. § 7413(b), whenever, on the basis of any information available to the Administrator, the Administrator finds that any person has violated or is in violation of any requirement or prohibition of, *inter alia*, the PSD requirements of Section 165(a) of the Act, 42 U.S.C. § 7475(a); the NESHAP requirements of Section 112 of the Act, 42 U.S.C. § 7412; Title V of the Act, 42 U.S.C. §§ 7661-7661f, or any rule or permit issued thereunder; or the PSD provisions of the Ohio SIP.

76. Section 113(b) of the Act, 42 U.S.C. § 7413(b), authorizes the United States to initiate a judicial enforcement action for a permanent or temporary injunction, and/or for the assessment of a civil penalty of up to $25,000 per day for each violation whenever any person violates any requirement of the Act. The Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, as amended by the Debt Collection Improvement Act, 31 U.S.C. § 3701, required the United States to adjust penalties for inflation on a periodic basis. Pursuant to 40

C.F.R. Part 19, the United States may seek civil penalties of up to $27,500 per day for each such violation occurring on or after January 31, 1997 and up to and including March 15, 2004; up to $32,500 per day for each such violation occurring on or after March 16, 2004 through January 12, 2009; up to $37,500 per day for each such violation occurring on or after January 13, 2009 through November 2, 2015; and up to $95,284 per day for each such violation occurring on or after November 3, 2015.

77. Section 167 of the Act, 42 U.S.C. § 7477, authorizes the Administrator to initiate an action for injunctive relief, as necessary to prevent the construction, modification, or operation of a major emitting facility that does not conform to the PSD requirements in Part C of the Act.

## GENERAL ALLEGATIONS

78. At all times pertinent to this civil action, Martin Marietta Magnesia Specialties was an owner and/or operator of the Facility.

79. Defendant produces and at relevant times has produced dolomitic quicklime or quicklime from dolomitic limestone by, among other things, burning raw materials in one of five kilns (numbered 1, 2, 4, 5, and 6) that Defendant operates at the Facility.

80. Emissions from Kiln #1 at the Facility are vented to an Electrostatic Precipitator ("ESP"). Emissions from Kiln #2 at the Facility are vented to a fabric filter. Emissions from Kilns #4, #5, and #6 at the Facility are vented to a single common fabric filter.

81. During the lime manufacturing process, the Facility emits pollutants, including but not limited to $NO_x$, $SO_2$, and particulate matter.

82. At all times pertinent to this civil action, the Facility was and is a lime manufacturing plant and a "major emitting facility" and "major stationary source" within the

meaning of the Act and the PSD regulations of the Ohio SIP. 42 U.S.C. § 7479(1); 40 C.F.R.
§ 52.21(b)(1).

83.      At all times pertinent to this civil action, the Facility was and is a "major source"
within the meaning of Title V of the Act, the federal Title V regulations, and the Ohio Title V
program regulations.  42 U.S.C. § 7661(2); 40 C.F.R. § 70.2; Ohio Adm. Code 3745-77-01(W).

**FIRST CLAIM FOR RELIEF**
PSD Violations  – Kilns #1, #2, and #6 – Violations  of 40 C.F.R. § 52.21

84.      Paragraphs 15 through 83 are realleged and incorporated herein by reference.

85.      The Facility's Kilns #1, #2, and #6 have at relevant times been major emitting
facilities and major stationary sources subject to the PSD requirements of the Act identified
above.

86.      EPA has conducted investigations of Defendant's Woodville Facility, which
included review of permitting history and emissions data, and analysis of other relevant
information obtained from the Defendant concerning construction and operation of the kilns.
The United States alleges the following based on EPA's investigations, information, and belief.

87.      Since the initial construction of the kilns referred to in Paragraph 85, one or more
of each of the kilns has undergone a major modification within the meaning of the PSD
provisions.  Such major modifications have resulted in a significant net emissions increase of
$NO_x$ and/or $SO_2$.

88.      On information and belief, the major modifications referred to in Paragraph 87
include, but are not necessarily limited to:  (1) a physical change and change in the method of
operation that allowed for a change in the type of fuel used at Kiln #1 and Kiln #2 in or around
1980 and 1982;  (2) a physical change consisting of the installation of a raw stone preheater,
multiclone dust collector, flue gas ducts and respective transfer equipment at Kiln #6 in or

around 1982; and (3) a physical change consisting of a replacement and upgrade of the internal components to Kiln #2 in or around 1996.

89.     Following the major modifications referred to in Paragraph 87, or the commencement of Defendant's ownership and operation of the Facility after such major modifications, Defendant has been in violation of Section 165(a) of the Act, § 7475(a), and 40 C.F.R. § 52.21, and the corresponding SIP for PSD, by failing to undergo PSD review for major modifications which caused significant net emissions increases of $NO_x$ and/or $SO_2$, by failing to obtain a PSD permit, and by failing to install and operate BACT for control of such air pollutants.

90.     Unless restrained by an Order of the Court, these violations of the Act and the implementing regulations are likely to continue.

91.     As provided in Section 113(b) of the Act, 42 U.S.C. § 7413(b), and Section 167 of the Act, 42 U.S.C. § 7477, and pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 3701, and 40 C.F.R. § 19.4, the violations set forth above subject Defendant to injunctive relief and civil penalties of up to $25,000 per day for each violation occurring on or before January 30, 1997; up to $27,500 per day for each such violation occurring on or after January 31, 1997 and up to and including March 15, 2004; up to $32,500 per day for each such violation occurring on or after March 16, 2004 and up to and including January 12, 2009; up to $37,500 per day for each such violation occurring on or after January 13, 2009 through November 2, 2015; and up to $95,284 per day for each such violation occurring on or after November 3, 2015.

## SECOND CLAIM FOR RELIEF
### PSD Violations – Kilns #1, #4, #5, and #6 – Violation of the Ohio SIP

92.     Paragraphs 15 through 83 are realleged and incorporated herein by reference.

93.     The Facility's Kilns #1, #4, #5, and #6 have at relevant times been major emitting facilities and major stationary sources subject to the PSD requirements of the Act identified above.

94.     EPA has conducted investigations of Defendant's Woodville Facility, which included review of permitting history and emissions data, and analysis of other relevant information obtained from the Defendant concerning construction and operation of the kilns. The United States alleges the following based on EPA's investigations, information, and belief.

95.     Since the initial construction of the kiln referred to in Paragraph 93, the kilns have undergone major modifications within the meaning of the PSD provisions. The major modifications have resulted in significant net emissions increase of $SO_2$ and $NO_x$.

96.     On information and belief, the major modifications referred to in Paragraph 95 include, but are not necessarily limited to, (1) a physical change consisting of a replacement and upgrade of the internal components to Kiln #1 in or around 2005; and (2) a physical change consisting of overhauling the tertiary crusher serving Kilns #4, #5, and #6.

97.     Following the major modifications referred to in Paragraph 96, Defendant has been in violation of Section 165(a) of the Act, § 7475(a), and the corresponding Ohio SIP for PSD, by failing to undergo PSD review for major modifications which caused significant net emissions increases of $SO_2$ and $NO_x$, by failing to obtain a PSD permit, and by failing to install and operate BACT for control of such air pollutants.

98.     Unless restrained by an Order of the Court, these violations of the Act and the implementing regulations are likely to continue.

99.     As provided in Section 113(b) of the Act, 42 U.S.C. § 7413(b), and Section 167 of the Act, 42 U.S.C. § 7477, and pursuant to the Federal Civil Penalties Inflation Adjustment Act

of 1990, 28 U.S.C. § 3701, and 40 C.F.R. § 19.4, the violations set forth above subject Defendant to injunctive relief and civil penalties of up to $25,000 per day for each violation occurring on or before January 30, 1997; up to $27,500 per day for each such violation occurring on or after January 31, 1997 and up to and including March 15, 2004; up to $32,500 per day for each such violation occurring on or after March 16, 2004 and up to and including January 12, 2009; up to $37,500 per day for each such violation occurring on or after January 13, 2009 through November 2, 2015; and up to $95,284 per day for each such violation occurring on or after November 3, 2015.

**THIRD CLAIM FOR RELIEF**
Title V Violation – Operation with a Deficient Permit

100.    Paragraphs 15 through 99 are realleged and incorporated herein by reference.

101.    As alleged above, Defendant commenced major modifications at the Facility as defined under the Act and the PSD regulations in the Ohio SIP. As a result, these modifications triggered the requirements to, among other things, obtain PSD permits establishing emission limitations that meet BACT and to operate in compliance with BACT. Defendant has failed to comply with these requirements.

102.    On or about March 25, 1996, Defendant submitted a Title V permit application (the "1996 Title V application") to the Ohio Environmental Protection Agency ("OEPA").

103.    The 1996 Title V Application did not identify the PSD regulations as applicable requirements.

104.    The 1996 Title V Application did not certify compliance with the PSD regulations or contain a compliance plan for achieving compliance with the PSD regulations.

105.    Defendant failed to submit a complete application, or to supplement or correct its application to provide additional information to address requirements becoming applicable after

the filing of its application, for a Title V operating permit for the Facility that identified all applicable requirements (including the PSD requirements and the requirement to comply with an emission rate that meets BACT for $NO_x$ and $SO_2$), that accurately certified compliance with such requirements, and that contained a compliance plan for all applicable requirements for which the source was not in compliance as required by Section 503(c) of the Act, 42 U.S.C. § 7661b(c), 40 C.F.R. § 70.5 and Ohio Adm. Code 3745-77-03.

106. Subsequently, Defendant obtained a Title V permit for the Facility. The Title V permit did not contain emission limitations for $NO_x$ and $SO_2$ that met the PSD BACT requirements.

107. Defendant failed to obtain a proper or adequate Title V operating permit for the Facility that contained emission limitations for $NO_x$ and $SO_2$ that meet BACT as required by Section 504(a) of the Act, 42 U.S.C. § 7661c(a), 40 C.F.R. §§ 70.1(b), 70.6(a) and Ohio Adm. Code 3745-77-07.

108. Defendant has thereafter operated the Facility without meeting such emission limitations and without having an operating permit that requires compliance with such emission limitations or that contains a compliance plan for all applicable requirements for which the Facility is not in compliance.

109. Defendant's conduct has violated Sections 502(a), 503(c) and 504(a) of the Act, 42 U.S.C. §§ 7661a(a), 42 U.S.C. §§ 7661b(c), 42 U.S.C. § 7661c(a), and the federal (40 C.F.R. Part 70) and Ohio (Ohio Adm. Code Chapter 3745-77) operating permit program regulations.

110. Unless restrained by an order of this Court, the violations identified in this Claim for Relief will continue.

111. As provided in Section 113(b) of the Act, 42 U.S.C. § 7413(b), and Section 167 of the Act, 42 U.S.C. § 7477, and pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 3701, and 40 C.F.R. § 19.4, the violations set forth above subject Defendant to injunctive relief and civil penalties of up to $25,000 per day for each violation occurring on or before January 30, 1997; up to $27,500 per day for each such violation occurring on or after January 31, 1997 and up to and including March 15, 2004; up to $32,500 per day for each such violation occurring on or after March 16, 2004 and up to and including January 12, 2009; up to $37,500 per day for each such violation occurring on or after January 13, 2009 through November 2, 2015; and up to $95,284 per day for each such violation occurring on or after November 3, 2015.

## FOURTH CLAIM FOR RELIEF
### Opacity Violation – Kiln 1

112. Paragraphs 15 through 83 are realleged and incorporated herein by reference.

113. At times relevant to this Complaint, the Facility has been and continues to be a major source of HAP emissions within the meaning of 40 C.F.R. § 63.1500(b), and subject to the Lime MACT, codified at 40 C.F.R. Part 63, Subpart AAAAA, and the NESHAP general provisions codified at 40 C.F.R Part 63, Subpart A.

114. For a lime kiln equipped with an ESP, the Lime MACT limits 6-minute average opacity for any 6-minute block period to 15 percent. Table 2 of 40 C.F.R. Part 63, Subpart AAAAA. Additionally, the NESHAP general provisions require that at all times, including periods of startup, shutdown, and malfunction, the owner or operator of an affected source must operate and maintain the source, including associated air pollution control equipment and monitoring equipment, in a manner consistent with safety and good air pollution control practices for minimizing emissions.

- 24 -

115.    Ohio EPA issued a Title V permit to Defendant with an effective date of June 20, 2003.  Defendant's Title V permit and associated Ohio SIP provisions codified at Ohio Adm. Code 3745-17-07(A)(1)(a) limit visible particulate emissions from Defendant's Kiln 1 to no more than 20% opacity, as a 6-minute average, except as provided for at Ohio Adm. Rule 3745-17-07(A)(1)(b).

116.    The purpose of the visible particulate limits contained in the applicable NESHAP regulations and the Facility's Title V permit is to help protect the public from unhealthy exposures to particulate.  Particulate emissions, in particular fine particulate, contribute to respiratory problems, lung damage, and premature deaths.

117.    Defendant has emitted visible particulate emissions in excess of the limits established by the Facility's Title V permit and the Lime MACT.  Since 2006, Defendant has reported over 100,000 minutes of opacity excess emissions for Kiln 1.

118.    The opacity excess emissions identified in Paragraph 117 constitute a violation of the opacity limits identified in Paragraphs 114 and 115.  Failure to comply with these limits constitutes a violation of the Lime MACT at 40 C.F.R. § 63.6(e)(1)(i); 40 C.F.R. § 63.7080 *et seq*.; Section 112(f)(4) of the Act, 42 U.S.C. § 7412(f)(4); Section 111(e) of the Act, 42 U.S.C. § 7411(e); Defendant's Title V permit and associated Title V regulations at 40 C.F.R. § 70.7(b); and Section 502(a) of the Act, 42 U.S.C. § 7661a(a).

119.    Unless restrained by an order of this Court, the violations identified in this Claim for Relief will continue.

120.    As provided in Section 113(b) of the Act, 42 U.S.C. § 7413(b), and Section 167 of the Act, 42 U.S.C. § 7477, and pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 3701, and 40 C.F.R. § 19.4, the violations set forth above subject Defendant

to injunctive relief and civil penalties of up to $25,000 per day for each violation occurring on or before January 30, 1997; up to $27,500 per day for each such violation occurring on or after January 31, 1997 and up to and including March 15, 2004; up to $32,500 per day for each such violation occurring on or after March 16, 2004 and up to and including January 12, 2009; up to $37,500 per day for each such violation occurring on or after January 13, 2009 through November 2, 2015; and up to $95,284 per day for each such violation occurring on or after November 3, 2015.

## PRAYER FOR RELIEF

WHEREFORE, based upon all of the allegations contained in Paragraphs 1 through 120 above, the United States of America requests that this Court:

1. Permanently enjoin Defendant from operating the Facility, including the construction of future modifications or reconstructions, except in accordance with the Clean Air Act and any applicable regulatory requirements;

2. Order Defendant to apply for and comply with permits for the Facility that are in conformity with the requirements of the PSD program and the Ohio SIP, and with the Title V Program;

3. Order Defendant to remedy its past violations by, among other things, requiring Defendant to install and operate BACT on the kilns at the Facility for each pollutant in violation of the PSD requirements of the Clean Air Act;

4 Order Defendant to achieve, maintain and demonstrate compliance with the Clean Air Act and its implementing regulations, including the NESHAP provisions; its Title V Permit or Permit Application requirements for the Facility; and related SIP requirements.

5.    Assess a civil penalty against the Defendant of up to $25,000 per day for each violation occurring on or before January 30, 1997; up to $27,500 per day for each such violation occurring on or after January 31, 1997 and up to and including March 15, 2004; up to $32,500 per day for each such violation occurring on or after march 16, 2004 through January 12, 2009; up to $37,500 per day for each such violation occurring on or after January 13, 2009 through November 2, 2015; and up to $95,284 per day for each such violation occurring on or after November 3, 2015.;

6.    Award Plaintiff its costs in of this action; and,

7.    Grant such other relief as the Court deems just and proper.

Respectfully submitted,

FOR THE UNITED STATES OF AMERICA

JEFFREY H. WOOD
Acting Assistant Attorney General
Environment & Natural Resources Division
United States Department of Justice


Date:   March 19, 2018          s/Jeffrey A. Spector
                                JEFFREY A. SPECTOR
                                Senior Attorney
                                Environmental Enforcement Section
                                Environment & Natural Resources Division
                                United States Department of Justice
                                P.O. Box 7611, Ben Franklin Station
                                Washington, D.C. 20044-7611
                                Telephone: 202-514-4432

Signature page for Complaint in *United States v. Martin Marietta Magnesia Specialties, LLC* (N.D. Ohio)

JUSTIN E. HERDMAN
United States Attorney
Northern District of Ohio


 s/Angelita Cruz Bridges
ANGELITA CRUZ BRIDGES
Assistant United States Attorney
Northern District of Ohio
Four Seagate; Suite 308
Toledo, OH 43604-2624


Of Counsel:

KATHLEEN SCHNIEDERS
Associate Regional Counsel
U.S. EPA Region 5
77 West Jackson Blvd., C-14J
Chicago, IL 60604

JS 44 (Rev. 06/17)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| UNITED STATES OF AMERICA, | MARTIN MARIETTA MAGNESIA SPECIALTIES, LLC, |

| **(b)** County of Residence of First Listed Plaintiff _____ *(EXCEPT IN U.S. PLAINTIFF CASES)* | County of Residence of First Listed Defendant  Sandusky *(IN U.S. PLAINTIFF CASES ONLY)* NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED. |
|---|---|

| **(c)** Attorneys *(Firm Name, Address, and Telephone Number)* Jeffrey Spector, U.S. Dept. of Justice, P.O. Box 7611, Washington, DC 20044-7611, 202-514-4432 | Attorneys *(If Known)* Susan Harris, Sidley Austin LLP, 1 South Dearborn St., Chicago, IL 60603, 312-853-4663 |
|---|---|

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☒ 1  U.S. Government Plaintiff

☐ 2  U.S. Government Defendant

☐ 3  Federal Question *(U.S. Government Not a Party)*

☐ 4  Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)* *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance ☐ 120 Marine ☐ 130 Miller Act ☐ 140 Negotiable Instrument ☐ 150 Recovery of Overpayment & Enforcement of Judgment ☐ 151 Medicare Act ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) ☐ 153 Recovery of Overpayment of Veteran's Benefits ☐ 160 Stockholders' Suits ☐ 190 Other Contract ☐ 195 Contract Product Liability ☐ 196 Franchise | **PERSONAL INJURY** ☐ 310 Airplane ☐ 315 Airplane Product Liability ☐ 320 Assault, Libel & Slander ☐ 330 Federal Employers' Liability ☐ 340 Marine ☐ 345 Marine Product Liability ☐ 350 Motor Vehicle ☐ 355 Motor Vehicle Product Liability ☐ 360 Other Personal Injury ☐ 362 Personal Injury - Medical Malpractice | **PERSONAL INJURY** ☐ 365 Personal Injury - Product Liability ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability ☐ 368 Asbestos Personal Injury Product Liability **PERSONAL PROPERTY** ☐ 370 Other Fraud ☐ 371 Truth in Lending ☐ 380 Other Personal Property Damage ☐ 385 Property Damage Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 ☐ 690 Other | ☐ 422 Appeal 28 USC 158 ☐ 423 Withdrawal 28 USC 157 **PROPERTY RIGHTS** ☐ 820 Copyrights ☐ 830 Patent ☐ 835 Patent - Abbreviated New Drug Application ☐ 840 Trademark **SOCIAL SECURITY** ☐ 861 HIA (1395ff) ☐ 862 Black Lung (923) ☐ 863 DIWC/DIWW (405(g)) ☐ 864 SSID Title XVI ☐ 865 RSI (405(g)) | ☐ 375 False Claims Act ☐ 376 Qui Tam (31 USC 3729(a)) ☐ 400 State Reapportionment ☐ 410 Antitrust ☐ 430 Banks and Banking ☐ 450 Commerce ☐ 460 Deportation ☐ 470 Racketeer Influenced and Corrupt Organizations ☐ 480 Consumer Credit ☐ 490 Cable/Sat TV ☐ 850 Securities/Commodities/ Exchange ☐ 890 Other Statutory Actions ☐ 891 Agricultural Acts ☒ 893 Environmental Matters ☐ 895 Freedom of Information Act ☐ 896 Arbitration |
| **REAL PROPERTY** ☐ 210 Land Condemnation ☐ 220 Foreclosure ☐ 230 Rent Lease & Ejectment ☐ 240 Torts to Land ☐ 245 Tort Product Liability ☐ 290 All Other Real Property | **CIVIL RIGHTS** ☐ 440 Other Civil Rights ☐ 441 Voting ☐ 442 Employment ☐ 443 Housing/ Accommodations ☐ 445 Amer. w/Disabilities - Employment ☐ 446 Amer. w/Disabilities - Other ☐ 448 Education | **PRISONER PETITIONS** **Habeas Corpus:** ☐ 463 Alien Detainee ☐ 510 Motions to Vacate Sentence ☐ 530 General ☐ 535 Death Penalty **Other:** ☐ 540 Mandamus & Other ☐ 550 Civil Rights ☐ 555 Prison Condition ☐ 560 Civil Detainee - Conditions of Confinement | **LABOR** ☐ 710 Fair Labor Standards Act ☐ 720 Labor/Management Relations ☐ 740 Railway Labor Act ☐ 751 Family and Medical Leave Act ☐ 790 Other Labor Litigation ☐ 791 Employee Retirement Income Security Act **IMMIGRATION** ☐ 462 Naturalization Application ☐ 465 Other Immigration Actions | **FEDERAL TAX SUITS** ☐ 870 Taxes (U.S. Plaintiff or Defendant) ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision ☐ 950 Constitutionality of State Statutes |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original Proceeding

☐ 2 Removed from State Court

☐ 3 Remanded from Appellate Court

☐ 4 Reinstated or Reopened

☐ 5 Transferred from Another District *(specify)*

☐ 6 Multidistrict Litigation - Transfer

☐ 8 Multidistrict Litigation - Direct File

| VI. CAUSE OF ACTION | Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity):* Clean Air Act, 42 USC 7413(b), 7477 Brief description of cause: Violations of Clean Air Act PSD regulations and Title V Permit opacity limits |
|---|---|

| VII. REQUESTED IN COMPLAINT: | ☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P. | DEMAND $ 20,000,000.00 | CHECK YES only if demanded in complaint: JURY DEMAND: ☐ Yes ☒ No |
|---|---|---|---|

| VIII. RELATED CASE(S) IF ANY | *(See instructions):* | JUDGE _____ | DOCKET NUMBER _____ |
|---|---|---|---|

DATE  3/19/2018

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF OHIO

**I.**   Civil Categories: (Please check one category only).

   1. [✓]   General Civil
   2. [ ]   Administrative Review/Social Security
   3. [ ]   Habeas Corpus Death Penalty

   *If under Title 28, §2255, name the SENTENCING JUDGE: _____

   CASE NUMBER: _____

**II.**   **RELATED OR REFILED CASES**. See LR 3.1 which provides in pertinent part: "If an action is filed or removed to this Court and assigned to a District Judge after which it is discontinued, dismissed or remanded to a State court, and subsequently refiled, it shall be assigned to the same Judge who received the initial case assignment without regardfor the place of holding court in which the case was refiled. Counsel or a party without counsel shall be responsible for bringing such cases to the attention of the Court by responding to the questions included on the Civil Cover Sheet."

   This action: [ ] is **RELATED** to another **PENDING** civil case [ ] is a **REFILED** case [ ] was **PREVIOUSLY REMANDED**

**If applicable, please indicate on page 1 in section VIII, the name of the Judge and case number.**

**III.**   In accordance with Local Civil Rule **3.8**, actions involving counties in the Eastern Division shall be filed at any of the divisional offices therein. Actions involving counties in the Western Division shall be filed at the Toledo office. For the purpose of determining the proper division, and for statistical reasons, the following information is requested.

   ANSWER ONE PARAGRAPH ONLY. ANSWER PARAGRAPHS 1 THRU 3 IN ORDER. UPON FINDING WHICH PARAGRAPH APPLIES TO YOUR CASE, ANSWER IT AND STOP.

   (1)   **Resident defendant**. If the defendant resides in a county within this district, please set forth the name of such county

   COUNTY:   Sandusky

   Corporation **For the purpose of answering the above, a corporation is deemed to be a resident of that county in which it has its principal place of business in that district.**

   (2)   **Non-Resident defendant**. If no defendant is a resident of a county in this district, please set forth the county wherein the cause of action arose or the event complained of occurred.

   COUNTY:

   (3)   **Other Cases**. If no defendant is a resident of this district, or if the defendant is a corporation not having a principle place of business within the district, and the cause of action arose or the event complained of occurred outside this district, please set forth the county of the plaintiff's residence.

   COUNTY:

**IV.**   The Counties in the Northern District of Ohio are divided into divisions as shown below. After the county is determined in Section **III**, please check the appropriate division.

**EASTERN DIVISION**

   [ ]   **AKRON**   (Counties: Carroll, Holmes, Portage, Stark, Summit, Tuscarawas and Wayne)
   [ ]   **CLEVELAND**   (Counties: Ashland, Ashtabula, Crawford, Cuyahoga, Geauga, Lake, Lorain, Medina and Richland)
   [ ]   **YOUNGSTOWN**   (Counties: Columbiana, Mahoning and Trumbull)

**WESTERN DIVISION**

   [✓]   **TOLEDO**   (Counties: Allen, Auglaize, Defiance, Erie, Fulton, Hancock, Hardin, Henry, Huron, Lucas, Marion, Mercer, Ottawa, Paulding, Putnam, Sandusky, Seneca VanWert, Williams, Wood and Wyandot)